UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,  )
                           )
v.                         )      NO.  3:10-cr-00250
                           )      JUDGE TRAUGER
MATTHEW DEHART             )
                           )

RESPONSE TO MOTION TO DISMISS

The United States of America, by and through Lynne T. Ingram and S. Carran Daughtrey,

Assistant United States Attorneys for the Middle District of Tennessee, hereby submits the

following response in opposition to defendant's Motion to Dismiss.  (R. 122: Motion to Dismiss;

R. 123: Memorandum).

**Statement of Facts**

Documented Facts:

On August 6, 2010, at approximately 8:00 a.m. the defendant was detained by United

States Immigration and Customs at the Calais, Maine Port of Entry into Canada.  (R. 123-1:

Medical Records, hereinafter "Exhibit 1," at 4; R. 123-2: Exhibit of Maine/New Hampshire

Reports, hereinafter "Exhibit 2," at 4).  The defendant was detained pursuant to "an alert that

DEHART was wanted for questioning in an espionage matter."  (R. 123-2: Exhibit 2 at 4).  The

defendant's interview began at 3:15 p.m. on August 6, 2010, and was conducted by the Federal

Bureau of Investigation (FBI).  (R. 123-2: Exhibit 2 at 4).  The defendant was further advised

that he was being questioned about his having visited an embassy in Washington D.C.  The

1

defendant also was advised of his constitutional rights, and he said he wanted to "plead the Fifth." (R. 123-2: Exhibit 2 at 4). Defendant was then advised that "pleading the Fifth" was only for court proceedings and was then read his rights. (R. 123-2: Exhibit 2 at 5). Defendant then agreed to speak with the FBI, but refused to sign the Advice of Rights form. (R. 123-2: Exhibit 2 at 5).

At approximately 5:20 p.m., the defendant was advised that he was under arrest for production of child pornography stemming from a federal warrant from the Middle District of Tennessee. (R. 123-2: Exhibit 2 at 6). At this time, the defendant acknowledged he had not been forthcoming regarding his visits to the embassies, and said he "would definitely cooperate at this point." (R. 123-2 Exhibit 2 at 6).

At approximately 5:58 p.m., the defendant was transported from Calais, Maine to Bangor, Maine. On the trip, the defendant continued cooperating regarding espionage issues. (R. 123-2: Exhibit 2 at 7). According to the FBI report, the defendant was booked at the Penobscot County Jail in Bangor, Maine, at approximately 7:30 p.m. on August 6, 2010. (R. 123-2: Exhibit 2 at 8).

On August 7, 2010, at approximately 12:55 a.m., the defendant was transported to the emergency room of Eastern Maine Medical Center with a main complaint of eye discomfort due to a possible pesticide exposure. (R. 123-1: Exhibit 1 at 4). Dr. Christopher Geertz treated the patient and completed a "Final Report" after treatment was complete. (R. 123-1: Exhibit 1 at 4). In his Final Report, Dr. Geertz stated that prior to the defendant being incarcerated "he had a possible pesticide exposure." (R. 123-1: Exhibit 1 at 4). The defendant reported to Dr. Geertz that "there were some pellets lying on the ground that he thinks were pesticides that he

apparently rubbed in his eyes and maybe rubbed on his skin, as well." (R. 123-1: Exhibit 1 at 4). Further, the defendant "again is not certain what these pellets were but he thinks they might have been pesticide. He cannot state why he rubbed them in his eyes and on his skin." (R. 123-1: Exhibit 1 at 4). Additionally, Dr. Geertz noted that the defendant was "restless and agitated, fairly tremulous as well as tachycardic." (R. 123-1: Exhibit 1 at 5). Defendant denied taking any illicit drugs. (R. 123-1: Exhibit 1 at 6). Dr. Geertz noted that the defendant appeared "to be paranoid and delusional with an idea of the FBI monitoring him and accusing him of espionage." (R. 123-1: Exhibit 1 at 6). After the examination, Dr. Geertz concluded that defendant's "acute psychosis associated with his tachycardia and tremors is most consistent with possible drug-induced psychosis such as secondary to amphetamines, cocaine, or other stimulant medications...Consider other toxic or metabolic pathology." (R. 123-1: Exhibit 1 at 7). Dr. Geertz further concluded that defendant may be suffering from "an acute psychotic break of bipolar disorder or schizophrenia." (R. 123-1: Exhibit 1 at 7). Before discharging defendant, at 3:05 a.m., Dr. Geertz noted that defendant was resting comfortably, and that his "tachycardia and tremors have resolved. He feels well for discharge." (R. 123-1: Exhibit 1 at 7). Dr. Geertz medically cleared defendant to return to the jail. (R. 123-1: Exhibit 1 at 8). He mentioned that he discussed at length with correctional officers that the patient required psychiatric evaluation while he was incarcerated, as well as reevaluation of the eye discomfort. (R. 123-1: Exhibit 1 at 8).

A jail document notes that DeHart was seen by a nurse at the Penobscot County Jail in Bangor, Maine, at approximately 10:00 a.m. on August 7, 2010. At that time, DeHart informed the nurse that he had been on a variety of medications that he had not refilled since the spring:

Lexapro, Wellbutrin XL, Abilify, Seroquel XR, Adderall XR, and Adderall.[1]  (R. 123-1: Exhibit 1 at 2).  DeHart did not provide any prescriptions in writing or on medication, likely because he had not been taking the medication for some time.

Defendant was interviewed by the FBI a second time, on that same date, August 7, 2010. The FBI report, which is classified but has been reviewed by the Court, reflects that DeHart was not asked about the pending child exploitation case.

Another Penobscot County Jail document indicates that DeHart was administered 50 mg of Thorazine[2] (two tabs of 25 mg each) on August 9, 2010.

A psychiatrist from Indiana apparently sent a letter written to Acadia Hospital Corp. and dated August 11, 2010, stating that DeHart had a diagnosis of a Mood Disorder Not Otherwise Specified and should be taking Lexapro, Abilify, Buproprian, and Seroquel.  (R. 123-2: Exhibit 2 at 27).

---

[1] According to the PubMed Health website, a service provided by the National Center for Biotechnology Information (NCBI) at the U.S. National Library of Medicine (NLM), these medications are used as follows:  Lexapro is used to treat depression and generalized anxiety disorder; Wellbutrin (Bupropion) is an antidepressant; Abilify is an atypical (second generation) anti-psychotic that is used to treat the symptoms of schizophrenia, episodes of mania or mixed episodes, bipolar disorder, and difficult-to-treat depression; Seroquel, also an atypical anti-psychotic medication, is used to treat the symptoms of schizophrenia, to treat or prevent episodes of mania, or depression in patients with bipolar disorder; and Adderall is used to control symptoms of attention deficit hyperactivity disorder.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/;
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970/;
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/;
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/;
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000166/.
[2] Thorazine (Chlorpromazine) is a conventional anti-psychotic medication that is used to treat acute and chronic psychoses, including schizophrenia and the manic phase of bipolar disorder, as well as amphetamine-induced psychoses.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000553/.

Defendant was interviewed by the FBI a third time, on August 19, 2010. Again, the FBI report, which is classified but has been reviewed by the Court, reflects that DeHart was not asked about the pending child exploitation case. Although DeHart provided information about his online accounts and cell phone usage, the prosecution team in this case was completely unaware of the rights waiver and signed consent form until those items were provide in the spring 2012, long after the investigation had concluded. (R. 123-2: Exhibit 2 at 10-15. Det. Kniss has already testified that he had not used any of that information to aid in his investigation. In fact, the local prosecution team has repeatedly stated that it has absolutely no intention of utilizing any information obtained from DeHart in August of 2010 in its case or to further the child exploitation investigation.

Unsubstantiated Allegations by Defendant:

The defendant has made a number of very serious allegations about having been mistreated, none of which are substantiated by the record or by affidavit of the defendant. In fact, some of these allegations are inconsistent with the records provided by the defendant in his Motion to Dismiss.

The first example is the defendant's allegation that he was given Thorazine intravenously on August 6, 2010. (R. 123: Memorandum). The medical records from the next day, written by an objective doctor who was unaware of the circumstances other than as provided by the defendant, do not indicate that any such drug was given but rather that the defendant's acute psychosis was "most consistent with possible drug-induced psychosis such as secondary to amphetamines, cocaine, or other stimulant medication." (R.123-1: Exhibit 1 at 7). Thorazine, on the other hand, has the opposite effect of a stimulant and is sometimes used to counteract

amphetamine-induced psychoses.[3]  The agents who interviewed him simply did not drug him on the day of his first interview on August 6, 2010, or during either of the two subsequent interviews on August 7, and August 19, 2010.  Instead, it appears that the medical staff at the jail first administered the anti-psychotic drug after the first two interviews and the visit to the emergency room for the self-inflicted injury to his eye.  (R. 123-1:  Exhibit 1 at 1).  It is hardly surprising that someone like the defendant who has a diagnosis of mood disorder, has failed to take his medication recently, has just been arrested, and is being questioned by the FBI about his visits to embassies, would have a psychotic episode as reported by the emergency room doctor.  Although the jail did not record the reason for first administering Thorazine, which might not be the newest anti-psychotic medication available, such a drug clearly is utilized to calm people who are having psychotic episodes such that it is not surprising that the jail made such an attempt to treat the defendant's symptoms of psychosis on August 9, 2010.  (R. 123-1:  Exhibit 1 at 1).

Next, although the defendant submits that proof of his being drugged was that his answers during the first interview were erratic, a review of the FBI report of the interview indicates that the defendant's answers to the agents were responsive.  The defendant points to errors in the recorded answers, but it is not even clear that the defendant's allegations about various events in his life are accurate or otherwise supported. The defendant's diagnosis of mood disorder and ADHD, along with his failure to take at least some if not all of the prescribed medication over the course of the last several months, could well explain the defendant's psychosis and confusion at the time of the interviews and his lack of memory about that time period.   Furthermore, defendant's memory of the interview was documented or recorded

---

[3] http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000553/

6

contemporaneously as was done by the interviewing agents. With regard to the final interview, the government notes that DeHart qualified a couple of consent forms he signed, allowing for search of some items but not others, which indicates that he was in full control of his faculties. (R. 123-2: Exhibit 2 at14-15).

Another of defendant's allegations is that "[t]here is no indication that defendant's assigned Assistant Public Defendant [in Maine] was notified of his hospitalization [for his eye injury], diagnosis with acute psychosis, or administration of mental health drugs." Defendant further alleges that his attorney was not given the opportunity to request a competency hearing and that he was not in a mental condition to waive his right to a preliminary hearing. But rather than attaching an affidavit of this attorney, the defendant simply relies on a report from a local newspaper that reported he collapsed in court. (R. 123: Memorandum at 4).

The remaining allegations are similar in nature in that there is no support for their accuracy, other than unsworn self-serving statements of a defendant who has a history of making misrepresentations about himself. In summary, the allegations are unsupported, and the government denies them entirely.

### **Legal Analysis**

I.      Dismissal of the Indictment Is Improper Remedy for Problematic Detention

Based on the allegations described above, the defendant claims that his treatment during his detention after arrest was so egregious as to shock the conscience of the Court and was in violation of the due process clause of the Fifth Amendment to the United States Constitution. (R. 123: Memorandum at 5). Even if this defendant were able to show that the conditions of his

7

detention were problematic, dismissal of an indictment is not a proper remedy for his alleged mistreatment. Under the longstanding *Ker-Frisbie* doctrine, *see Frisbie v. Collins,* 342 U.S. 519, 522 (1952); *Ker v. Illinois,* 119 U.S. 436 (1886), neither the manner by which a defendant is brought to court for prosecution nor the conditions of his confinement prior to that prosecution are valid grounds for dismissal of an indictment. Indeed, research indicates that no court has ever dismissed an indictment on such grounds. The application of the bedrock *Ker-Frisbie* rule is particularly compelling where, as here, the alleged mistreatment that forms the basis for the motion has no connection whatsoever to the defendant's criminal conduct, indictment, transfer to this Court's jurisdiction, or criminal prosecution. Moreover, there are more appropriate and better tailored means of redressing the alleged government misconduct. For example, a defendant could move to suppress any statements that he alleges were the product of coercive questioning, although the government has previously informed the Court that it does not intend to offer at trial in this case any of the statements the defendant made in response to interrogation in August 2010 and this Court is aware that these interviews were completely unrelated to the child exploitation cases. Finally, such an extraordinary remedy would interfere with the substantial public interest of determining guilt and bringing criminals to justice.

II.    <u>Unsubstantiated Allegations of Government's Failure to Preserve Exculpatory Evidence Does Not Warrant Dismissal of the Indictment</u>

The defendant asserts that the government failed to preserve exculpatory evidence but fails to explain how such evidence is exculpable or show that the government acted in bad faith. Pursuant to *Arizona v. Youngblood*, unless a defendant can show bad faith on the part of law enforcement officers, failure to preserve potentially useful evidence does not constitute a denial

8

of due process of law. 488 U.S. 51, 58 (1989). Requiring a defendant to show bad faith both limits the extent of the government's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where interests of justice most clearly require it, that is, those cases in which law enforcement officers themselves, by their conduct, indicate that evidence could form basis for exonerating defendant. *Id.*

In this case, the defendant first argues that Det. Kniss returned two cell phones to James's family without completing a forensic analysis or report. In a letter to defense counsel date June 27, 2012, the undersigned explained why the child's phone had been returned to him: "The reason the phone was not maintained is because it had very little evidence on it. What evidence was contained on it was displayed and photographed. Those photographs were provided in discovery on November 22, 2011, in a folder called 'text messages.'" According to Det. Kniss, a forensic analysis was not possible on that phone, which was why the evidence was preserved in the way described in the June 2012 letter. Det. Kniss examined the phone, preserved evidence that appeared to be relevant or exculpatory, and had no reason to believe that the defendant would later claim that there was missed exculpatory evidence on the phone. The second phone examined had no evidence related to the case on it, which is why it was returned to the family.

The defendant next argues that the government had a duty to send preservation letters and request content for all telephones potentially related to this case, including the defendant's phones. Likewise the defendant argues that the government had a duty to send preservation letters for the defendant's email accounts and gaming account, which he now claims contained exculpatory evidence. The defendant does not cite any authority to support his allegations that the government has a duty to preserve all potential evidence, nor has the defendant explained

9

how the material would be exculpatory or material, or how the government would have known it contained exculpatory evidence. Had the defendant wanted to access his own accounts, he could have done so at the onset of the investigation, back when the search warrant was first served in Indiana. Furthermore, although the FBI agents in Maine requested permission to assume defendant's online identity, the local prosecution team understands that the request was made as part of the national security investigation and that government never assumed defendant's online identity.

In summary, the defendant has failed to show that the government could have known that any of this evidence could have played a significant role in DeHart's defense. Furthermore, the defendant has failed to show that this evidence would have been favorable and material.

10

## Conclusion

For the reasons stated above, the government requests this Court deny defendant's motion to dismiss the indictment.

Respectfully submitted,

JERRY E. MARTIN
United States Attorney for the
Middle District of Tennessee

s/ Lynne T. Ingram
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: 615/736-5151

s/ S. Carran Daughtrey
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: 615/736-5151

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served electronically or by mail to Mark C. Scruggs, attorney for defendant, on this, the 26th day of October, 2012.

<u>s/ S. Carran Daughtrey</u>
S. Carran Daughtrey

12