# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| **V.** | } | **Criminal Docket No. 3:10-cr-00250-1** |
| | } | |
| **MATTHEW PAUL DEHART** | } | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS

The Defendant, Matthew Paul DeHart, respectfully submits the following supplemental memorandum in support of his motion to dismiss. He realizes that submitting this directly to the Court is unusual and references his reasoning in (See Exhibit #1) (Refer to Document Nos. 123-2).

### Introduction

*We are not to simply bandage the wounds of victims beneath the wheels of injustice, we are to drive a spoke into the wheel itself.* - Dietrich Bonhoeffer

The Defendant would argue that the pattern of government behavior from the inception of the case against him and in nearly every phase of the case since the initial handling of evidence to his mistreatment at the border amounting to torture and more recent rights violations which taken in their entirety amount to outrageous government conduct.

While the Defendant notes that any single or temporary abridgement of his rights may not warrant dismissal, the deliberate and unwarranted nature of government actions in this case "Shock the Conscience" not due simply to his torture at the border but by the shear brazenness

of the government in trampling the Defendant's rights. These actions cannot be justified by any alleged act committed by the Defendant and were pursued in the act of furthering a national security investigation. The methods used by the national security investigators in conjunction with the TN prosecution have made it impossible for the Defendant to receive a fair trial in TN. The Defendant has been accommodating and patient while attempting to build his defense while the prosecution has deliberately inhibited it. Moreover the government is again threatening prosecution in another district. The defense believes it is the intent of the TN prosecution to have NY indict or introduce NY-based information in this district based on data which the Defendant believes is being deliberately misrepresented and attributed to him. Threats of prosecution in other districts have been a persistent theme of the prosecution in TN for more than a year.

## Background

The Defendant, Matthew DeHart, has been an internet "hacktivist" who has been involved with the "Anti-security Movement" since high school when he formed a hacker group which worked with the Cult of The Dead Cow (COTDC). While living in NY in 2003, he became associated with 4chan.org and several related on-line image boards as a moderator. 4chan moderators developed a working relationship with the FBI in reporting instances of people posting child pornography (CP) online. He has been involved with the group named "Anonymous" since its inception as it was born on 4chan. (See Exhibit #2 - Defendant's Affidavit)

As the Defendant's theory of anonymous protest required secrecy and freedom from surveillance, servers were established and only accessible through the TOR network. TOR or The Onion Router is software which has created a private, anonymous network of computers which can both allow for surfing as well as file hosting anonymity. Computers running TOR and other related software are collectively known as "the deep web" "or the "dark net." It is

2

basically a parallel "internet" but with much more anonymity. The freedom of expression the TOR network provides allowed democratic movements in Tunisia and Egypt to ascend since those governments had restricted citizens' access to the traditional internet. The United States due to its preoccupation with national security, corporate intellectual property interests, and the embarrassments provided by Wikileaks, has chosen to attack this network. While it cannot directly oppose TOR's existence (DOD helped fund its creation) it has sought to unmask those who use it in any manner the government considers "threatening" – such as whistle blowing.

Prior to the leaking of the "Collateral Murder" video showing American helicopter gun camera footage of the killing of civilians in Iraq, public criticism of Wikileaks by the government was muted. The release of the 9/11 transcripts on Wikileaks in late 2009 drew louder government criticism. Any open submission file sharing sites on the TOR network drew increased scrutiny but according to press reports, investigations that focused on domestic activist groups friendly to Wikileaks became more of a government priority.

The Defendant was part of a so-called "black-hat" Anonymous subgroup (the remnants of which comprise AntiSec (following the operation which bore the same name) and administered a network of file sharing servers. In word and deed the government has linked Anonymous, its subgroups, and associated servers with Wikileaks.

[Much in the same way the web servers displaying the Youtube™ website do not hold the videos themselves (those are saved on different computers [file servers] in different locations), the defendant did not physically possess any files listed on the site (site in this sense means the page at a .onion). It must also be mentioned that unlike normal websites which are known by their domain name such as Amazon.com or eBay.com, a .onion domain name is (mostly) random (for example: gxjh29cztrvs7iia.onion might be the name of a Wikileaks submission server). There are directories which list the site names and domains, but many remain known to only a select few people. The defendant's file sharing network was relatively well known. To the several other individuals possessing the servers which actually held the files it was known as FON. To the public it had a different name.]

The unique aspect of FON and its closely related site, sTORage is that anyone could upload and download files to and from it. (See Exhibit # 3- a print-out of the sTORage website listing files including a backup of FON files in a directory with the same name). There are file names listed in the Defendant's discovery which match those in Exhibit #3. In discovery Det. Kniss notes these file names appear linked to an F: drive on the Defendant's laptop which the Detective maintains is an external hard drive. In fact, the files in discovery associated with these names if valid most likely resided on the FON server *online* and were not in possession of the Defendant. Many of the file names are completely unknown to the Defendant.

Quite a few members of Anonymous would share files on the FON server. Most of this content was random like that posted on 4chan but with more politically/corporately sensitive files. Like most public file hosting sites FON had a "no CP policy." But, unfortunately people could and would upload that type of material which administrators would then have to delete. Only administrators on the FON server could remove files. Of course this meant that since storage space could fill up quickly junk files or unreasonably large ones would need to be purged regularly. If a file had an obvious CP name it would be deleted. If it was questionable and didn't have a password, it would usually be inspected and any offending content would be deleted. This made up a very small part of the content of the FON server.

What drew interest from federal law enforcement on TOR file sharing services was the content related to leaks of all sorts – government and corporate. When law enforcement began to suspect Anonymous' association with uploading leaked material to Wikileaks specifically, the Defendant believes federal officials began viewing Anonymous as less of a cyber crime threat and more of a national security threat. This is in line with public statements from US officials and the unprecedented pressure to prosecute whistleblowers.

The defense would note that a website on the "normal" internet, anonib.com, used the FON network to back up its files (See Exhibit # 3 as an example). As a popular site, many

4

anons and 4chan users would use the anonib website.   Regrettably anonib.com became a place where anons of any age (they're anonymous) would exchange sexting pictures and videos.   This takes place on such a wide scale that it does not stand out as unusual to most of the anon or younger generation internet community.   The only pornography which would be deleted on a regular basis from these image board sites was that which was obviously CP.

If the Defendant had access to his primary email account erlousung@gmail.com he would be able to show IRC logs discussing cooperation with the NCMEC in some related areas. Unfortunately, the government obtained permission from the Defendant under duress to assume his online identity and take over this account.  And, as has been noted elsewhere this account is now deleted and according to Google is unrecoverable.

The Defendant is aware that he has no means of proving these assertions, beyond his personal knowledge of how these things work in TOR, since Anonymous online activities are by their nature anonymous.   The Defendant is unaware of any independent experts who could testify regarding this.

The defense is convinced that a local investigation started in Franklin, TN remained dormant until information it uncovered triggered another, national security investigation.  The defense can come to no other conclusion to fit the facts.  The Defendant's behavior corroborates his assertions.  The Defendant was tipped off by one of the alleged victims in Jan 2009 about the investigation in TN and yet went on with his normal life routines for over a year.  Following the search and seizure of his residence in Indiana in 2010, he left and re-entered the country twice legally.  The Defendant was not concerned about defending a CP case.  He was concerned about securing IronKey encrypted thumb drives which contained information about his activities with the group Anonymous.

## Statement of Facts:

## The Need to Inspect Physical Items Seized

The defense's forensic expert was only recently allowed to view material in a government facility only after concessions, which were in conflict with items the prosecution already agreed to provide, namely; physical media for inspection as well as related chain -of-custody documentation.  (See Exhibit #4, page 2, paragraph 5)

Both the Gateway laptop and an external drive taken in the January 2010 search were mentioned in the national-security related FD-302. The FBI would have been remiss in their continuously thorough investigation of the Defendant and his family for national security matters if it had not also searched the data from this device.  The prosecution made no allegations of actual child pornography possession until after the August 2010 interrogations of the Defendant. The Defendant believes the benefits to the government of introducing CP on the Defendant's media would outweigh the risks of violating the law.  Given the government's potential access to TOR servers this would not have been difficult. In FBI terminology, this is known as OIA or Otherwise Illegal Activity.

> [It is noted that the FBI is authorized to engage in such activity per 17.5C of the FBI Domestic Investigations and Operations Guide.]

The defense realizes how unusual and unbelievable a claim of such behavior on the part of the FBI would appear but believes its plausibility would be in line with other behavior already known to have occurred such as torture.  Even if this is disputable, the prosecution has informed the defense that Det. Kniss only received an alleged copy of the Gateway laptop's hard drives (as an undated RAID reconstruction) in July 2010.  Since the hard drives were seized on January 25th 2010 and according to the record were imaged on January 29th and 30th (2 drives) (See Exhibit # 5 provided in discovery) , it makes no sense to the defense  why the lead and only stated investigator on the official case-in-chief of the government would not receive even a

forensic copy until five plus months later. This delay followed over a year between the initial complaint to the Franklin Police Department in January 2009 and the January 2010 Indiana Search Warrant. For these reasons the defense requested to inspect the *physical* Gateway laptop in its July 2011 letter to the prosecution.

Upon entry to the government facility, the defense's expert learned he would only be working with copies of media. As per Rule 16(a)(E)(iii) the defense can inspect any tangible object taken from the Defendant. The Defendant in this specific instance was not interested in the data on copies of his media since he is defending a CP *possession* charge, but rather the physical integrity and chain-of-custody of the original Gateway laptop and its associated hard drives.

In discussions with the prosecution at the June 2012 hearing on the defense Motion to Compel the defense was led to believe that the government would provide such access. (See exhibit #6)

In the June 2012 hearing, the government informed the defense that it would be seeking a superseding indictment for *possession* of CP. The government informed the defense that it had recently received a decrypted hard drive from the FBI containing CP in addition to another external drive allegedly taken in the Indiana Search Warrant of January 2010 which had no encryption according to the government and which was being examined by Det. Kniss as early as April 2012. The government claimed that this encryption-free external hard drive also had child pornography on it. The actions of the Defendant in voluntarily crossing back into the US on foot from Canada with a return bus ticket and Canadian student Visa paperwork show he was either unconcerned about alleged CP obtained in the Indiana Search Warrant, or he forgot he had an unencrypted hard drive to compliment his encrypted drive both allegedly containing CP. Either strains credibility.

In reference to the "decrypted" drive, the "drive" the government provided to the defense forensic expert was an image of a drive not an actual "decrypted" drive itself. As there was no original image made of this encrypted drive following the Indiana search, the Defendant calls into question the integrity of the data from a disk image created after the "decryption" especially without a physical chain of custody. As a hard-encrypted (physical encryption chip) hard drive must often be physically altered to attempt a brute-force password crack, inspection of the drive is important from a forensics perspective. Even assuming the future provision of the physical chain-of-custody, the FBI did not allegedly gain access to this drive until after the August 2010 interrogations, meaning there could have been no data chain-of-custody until after the August 2010 interrogations. It was during these interrogations where the Defendant was coerced to give passwords and other information to the FBI.

### The Canadian Connection

According to Canadian newspaper article, Canadian law enforcement was asked by US authorities to assist in a child pornography production investigation originating in the Middle District of TN (See Exhibit #7). As the TN prosecution previously asserted no connection with these Canadian computers, it was either unaware of this Canadian assistance, or as the Defendant maintains the government used the same ruse to obtain more of the Defendant's computer equipment for its national security investigation. The Canadian law enforcement stated they would investigate if any CP was produced in Canada. The defense is aware of no details of this investigation by the Canadian government.

The defense believes the government's actions in this regard are not only outrageous in the fact they unnecessarily slandered the Defendant in nation-wide Canadian press solely for the furtherance of a classified national-security investigation, but also for the following reason: in response to the defense counsel's request for access to these Canadian computers/hard drives, the TN prosecution replied in Section 2, number 4 of the June 27th 2012 response letter:

8

"In order to get access to the evidence in Canada that you requested, we submitted a MLAT to the Canadian government, who granted our request. Since the government is prohibited pursuant to the 18 USC §3509(m) to release any child pornography, Det Kniss reviewed the evidence from Canada and Maine to determine whether it contained any contraband. As you know, the government does not intend to use any of this evidence in its case in chief, although should know that you {sic} client continued to solicit child pornography from a victim in Maryland after the search warrant was executed at his home on January 25th, 2010."

The TN prosecution's wording makes it seem as if it initiated an MLAT with Canada in response to the Defendant's request for exculpatory evidence. In fact, the evidence from Canada was sitting in Washington, DC since March 2011 ( See Document No. 123-2 page 9).

The prosecution told defense counsel that there was CP on these Canadian hard drives after Det. Kniss' examination. This was the stated reason the defense was denied independent access to the physical media. The prosecution would have the court believe that like the second non-encrypted drive allegedly taken in the 2010 Indiana Search Warrant, the Defendant either forgot he had CP on all of his Canadian computers or didn't care when he directed his defense counsel to request access to them and argue in court their relevance over the TN prosecution's assertions otherwise.

The Defendant would ask that the court note the incomplete inventory of items seized in Canada and at the US border. (See Doc No 123-2, page 9) This was provided by the FBI, along with the FD-302. These items were stated to be located in Washington DC and were in FBI custody. All four hard drives from the defendant's three Canadian computers are listed here. Each was bagged and sealed by Charlottetown Police. These physical, bagged, and sealed hard drives (not copies/images) were in an FBI evidence bin in Washington DC as of 3/22/2011, fully a year before the defense requested them.

As the FBI inventory notes control numbers and specific models/sizes of hard drives known to the Defendant, the defense has no reason to doubt the authenticity of this document. However, the prosecution did not provide copies of the MLAT request to Canada dated

9

sometime before March 2011 (See Document No. 123-2, page 9) for a search and seizure for CP in relation to the TN case as part of the discovery process.

The Defendant's father was told during his grand jury testimony in Washington, DC concerning the national security investigation of the Defendant in Sept/Oct 2010 that the government was working on getting the Defendant's computers from Canada (See Exhibit #8). In light of this, and confirming the TN prosecution's earlier claims the seizure in Canada was unrelated to TN, **the computer hard drives from Canada appear to have been obtained for the national security investigation.** Either these hard drives from Canada and sitting in DC at least as early as 3/22/2011 were never analyzed by the FBI prior to the TN inspection by Det. Kniss a year later; or they were analyzed by the FBI which found no CP; or they were analyzed by the FBI which found CP but did not feel the need to share this with the TN prosecution; or the TN prosecution was made aware of CP on these drives, kept this fact from the court and the Defendant for well over a year, and had Det. Kniss perform a redundant examination. Any of these possibilities is outrageous.

## The National-Security Investigation

The government's intense interest in the Defendant's visit to the Russian embassy in February 2010 and its desire to assume his online identity after his interrogation in August 2010 are especially noteworthy.

> [The majority of the Defendant's 150-person World of Warcraft Guild were members of Anonymous and therefore would have been of interest to national security investigators. These Anonymous members played the same games and used the same STEAM game/chat platform as the defendant as well as members from the Indiana Air National Guard unit to which the Defendant belonged   The defendant's Air National Guard Unit in Indiana is involved with cutting-edge drone operations. PFC Bradley Manning, who is in federal custody for leaking sensitive material to Wikileaks, was also associated with many of the same people indirectly or otherwise as the defendant. It is obvious that the FBI sees Wikileaks and associated groups including Anonymous as major national security threats. Most importantly, however is the file referenced in the Defendant's affidavit (See Exhibit #2). The cost/benefit analysis of using whatever means necessary to

prevent certain information from going public would seem to justify the type of behavior the Defendant alleges.]

As the court is aware, national security investigations allow for much wider investigative powers, are less concerned with civil liberties, and can utilize classified means to accomplish their goals.

The national security investigation involving the Defendant including the assumption of his identity is *ongoing* as far as the Defendant knows and contrary to any government assertions. This online identity includes "Matthew DiMarco" used by the Defendant since 2005 and cited in the TN investigation, and could potentially include other user names which as the prosecution asserted (the Defendant strongly denies) would include falsely represented user names in the TN investigation. This "online identity" includes user names for email, messaging, social media, and most importantly user names and passwords for computer servers. The defense has been provided no evidence of official statements resulting from "this identity assumption" save the fact that the Defendant's primary email address is no longer accessible. As it was this online "Matthew DiMarco" identity used by the Defendant in his Anonymous activities; as it is also one of the focii of the TN indictment; as none of the online information supporting the indictment seems to have been preserved by the government or just hasn't been provided to the defense; as the government obtained control of the Defendant's online identity in August 2010 and onward; as the Defendant remained in custody with limited access to defensive material, the Defendant cannot access the most important evidence in his defense.

Even if the government continues to maintain that there are two entirely unrelated cases against the Defendant, the fact is that much of the same evidentiary material is being used in a mostly classified investigation as well as a CP prosecution with traditional limits on discovery. It has had the effect of making the defense of either issue unreasonably difficult if not impossible. This was entirely due to the government's decision to create a ruse preventing any potential release of classified materials utilizing CP laws according to the defense. The prosecution can

dispute this but the events in Maine/NH involving custodial national security interrogations were only made possible by the MDTN arrest warrant.

This is not specifically a suppression issue as the Defendant has never been concerned with CP possession accusations. The government did not indict on CP possession and no other district in the US has indicted on CP possession including the Southern District of Indiana where the Defendant lives.  In the 27 months since the Defendant's arrest and 33 months since the 2010 search warrant the actual existence of the CP was never the focus of the prosecution; text chats were.  There was no mention of actual CP content until after the interrogations and the assumption of the defendant's online identity in August 2010.  Following the two years of delays since this event, the government is now seeking to introduce in this district "new" evidence from the FBI and is trying to use the same to obtain indictments in other districts.  Like other evidence in this case, there is no documented chain of custody, no provision for physical inspection, and in this instance, no forensic reports.

Should the US District in Washington, DC choose to prosecute the defendant on national security related charges using evidence from the Indiana Search Warrant or from Canada, the Government's 18 USC 3509 (m) provisions will prevent the Defendant from obtaining any encrypted files necessary to mount a national security-related defense.  Moreover, should a jury convict the defendant in TN due to his inability to obtain exculpatory evidence, DC will have no need to prosecute and any concerns involving classified and/or leaked materials will be eliminated as hard drives in CP cases are routinely destroyed.

### Significance of Not Having a Preliminary Hearing

The Defendant would also note the following.  Suffering from a psychotic break and being medicated with Thorazine, the Defendant was in no condition to waive a Preliminary Hearing in Maine in 2010 nor was he aware of its significance to the defense of his case at the

12

time.  Had he been in a mental condition to fully participate in a Preliminary Hearing he would have been able to challenge a number of things.

As the Defendant was aware of the claims in the January 2010 search warrant, it stands to reason that the Defendant would have prepared some type of defense in that regard prior to his arrest in August 2010.   The Defendant was not arrested at the time of the January 2010 search warrant.  Basically, most of the same information contained in the search warrant was used in the criminal complaint.  The Defendant believed the information about Anonymous and exculpatory information needed to defend the charges in TN was secure in his Canadian apartment when he crossed the border on Aug 6th 2010.  The Defendant could have been reasonably expected to challenge the probable cause in the criminal complaint if granted a Preliminary Hearing.

The Defendant had purchased three computers following the January 2010 search warrant. On one of these computers (the tower PC), the Defendant had saved server logs and emails disproving the claims he was impersonating females to solicit CP.  Since obtaining this material (which the Defendant would have requested) would have been instrumental in rebutting the probable cause in the criminal complaint, his inability to attend a Preliminary Hearing allowed this to go unchallenged.

The government withheld information from the defense regarding the Defendant's psychotic break on August 7.  Therefore, his defense was unaware and denied the opportunity to have him evaluated.  The Defendant was in no condition to waive a Preliminary Hearing which would have allowed his defense to challenge falsehoods in the probable cause and search warrant and could have possibly affected the detention order against him.

Resulting from the denial of this hearing, the Defendant was placed in a position where he continued to be interrogated without a lawyer and without medical follow up.  This lead directly to his signature of multiple consent forms with no advantage offered to him.

Adding insult to injury, the FBI ended up seizing the Defendant's computers from Canada following an August 19th search-by-"consent" of the Defendant's Canadian apartment by Canadian law enforcement. The consent was obtained from the Defendant in a diminished mental state in NH with no access to legal counsel from agents seeking national security information not concerning CP. Yet, as Canadian newspaper accounts attest, the Canadians were led to believe the search was for CP.

Finally, Defendant would note in the Criminal Docket for his case entry #3 in reference to the US District of Maine states:

"...waived hearings in that district; requests hearings in prosecuting district." This affirms the Defendant's assertion that his counsel in Maine advised him to waive his Preliminary Hearing in Maine because he would be allowed that a Preliminary Hearing in the Middle District of TN. He was not allowed a Preliminary Hearing in TN.

**Conclusion**

The Defendant is absolutely aware of the unprecedented arguments he has presented. The action of the US government to seize his computers in Canada for national security reasons under the umbrella of a search for CP alone then claim Walsh protection to deny the Defendant full access to these same computers (or drives) seems to be unprecedented. Recent arrests of Anonymous members, the mistreat of accused whistleblower PFC Bradley Manning, the asylum situation of Julian Assange, combined with recent rhetoric from senior US officials regarding cyber space as the new battlefield and hacktivists as terrorists lay the ground work for such outrageous conduct where the end justifies any means including violation of Constitutional rights. The extended pattern of abuse on the part of the government including the Defendant's torture in Maine and NH present the clearest example of Rehnquist's hypothetical "outrageous government conduct." Clearly, delays in producing discovery, especially that which was said to be taken from Indiana have been of great benefit to the government while only detrimental to the

defense. The only sources of exculpatory evidence available to the Defendant have been rendered inaccessible while the government has continued to mislead the defense with discovery issues. Given the potential access the FBI has to the shared data storage the Defendant administered on line along with the fruits of its national security investigation the Defendant is unable to prepare a defense and has been deliberately and unduly prejudiced. The Defendant isn't surprised to note that alleged "victims" have been identified in NY and MD conveniently where Anonymous-related online servers happen to be located. He does not believe this is a coincidence.

It is for the reasons above and articulated in the original Motion to Dismiss that the Defendant requests the case against him be dismissed, he be released from custodial supervision, and that all property taken from him in Indiana, Maine, or Canada be returned or the monetary value of items (and data) the government is unable to return due to legal limitations be given back to the Defendant.

Respectfully submitted,

Matthew P. DeHart

Defendant

8900 Andrea Court

Newburgh, IN 47630

812.549.9371

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Ms. Carrie Daughtrey, Assistant U.S. Attorney, 110 Ninth Avenue South, Suite A-961, Nashville, TN 37203, on this the _6th_ day of November, 2012

Matthew P. DeHart