# IN THE UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | } | |
| | } | |
| V. | } | Criminal Docket No. 3:10-cr-00250-1 |
| | } | |
| MATTHEW PAUL DEHART | } | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF

## MOTION TO SUPRESS EVIDENCE

The Defendant, Matthew Paul DeHart, respectfully submits the following supplemental memorandum in support of his motion to suppress evidence. He realizes that submitting this directly to the Court is unusual and references his reasoning in (See Exhibit #1 of the Defendant's Supplement to Motion to Dismiss) (Refer to Document Nos. 1, 80, 88-1, 105, & 123-2).

ARGUMENT

### Part I- *Franks* misrepresentations

The defense raises the issue of whether it was reasonable to believe that there was probable cause implicating the Defendant in the alleged crimes committed. Considering the fact that affidavits can be sent electronically and given the fact that Det. Kniss was the lead investigator in the Tennessee investigation he could have sworn out an affidavit. Instead, a Vanderburgh County, Indiana (not the Defendant's county of residence) detective with no direct knowledge of the case (he listed Memphis,

TN as the location where solicitation allegedly occurred) swore out the affidavit. It would reflect bad faith if such actions were done to insulate Det Kniss from having to swear an affidavit. It would also reflect bad faith if some of the items seized in the search made their way to Washington, DC as part of the national security investigation prior to Det. Kniss reviewing all of the evidence. Further bad faith is illustrated by misrepresentations contained in the search warrant illustrated below.

There are numerous material misrepresentations of the facts in several of the documents used in support of the search warrant. In Franklin Police Department Det. Sgt. Anderson's undated Investigative Synopsis Initial Summary (See Document No. 88-1, page 9) he states:

"…the suspect asked them to take pictures of their penis and send it to an email account allegedly belonging to some females named 'Erica' and 'Mandy'".

"…there is no independent confirmation that the females exist."

In fact, **there was independent confirmation**. A return from AOL for data on the screen name, mandyylion092 dated 06/01/2009 provided to the defense in discovery (See Exhibit #1, pages 1-2) shows a zip code of 07882, Washington, NJ, and **NOT** Indiana. This is the screen name which Det. Kniss labels as "(alleged female from Indiana)" in his probable cause (See Document No. 88-1, pages 12 & 13). The return clearly shows that someone with a screen name "mandyylion092" which one could reasonable equate with a "Mandy" created and registered an AOL account in 2008 in **NJ.**

Additionally, the Affidavit for Search Warrant by Det. Pritchett of the Evansville Police Department (See Document No. 88-1, page 2) in paragraph (A) notes that he is:

"investigating the crime(s) of: Possession of Child Pornography and Child Solicitation occurring between Jun 2008 through January 2009 at the location of Memphis TN and Warrick County, Indiana."

2

**There is no mention of Franklin, TN or the Middle District of TN** where the alleged victim in this case resides. Indeed the warrant cites a MEMPHIS FBI CASE 305A-ME-C60020 (See Document No. 88-1, page 1). In his Supplemental Report (See Document No. 88-1, page 8) Det. Pritchett in speaking of the Defendant states *as a fact* that:

> "He has posed as juvenile females to obtain these photographs and video by electronic communications."

Det. Pritchett could have had no firsthand knowledge in order to make this statement.

Further, in Franklin Police Department Det. Sgt. Anderson's undated Investigative Synopsis Initial Summary (See Document No. 88-1, page 9) he states of the alleged victims:

> "Both boys have met with the suspect on at least two different occasions in Franklin, Tennessee...The boys have identified DeHart from his Indiana Drivers license photo in a photo lineup."

In fact, AUSA Daughtrey's November 22, 2011 letter RE: Supplemental Discovery in the matter of United States v. Matthew Paul DeHart Case No. 3:10-cr-00250 (U.S.D.C. M.D. Tenn.), paragraph 14 (Exhibit # 2, pages 3, paragraph 14) says regarding a photo lineup shown to the alleged victims:

> "According to the investigative report, Detective Brett Kniss made a photo lineup with the defendant's picture included. The array was presented to both victims. The first victim (identified in Count One of the indictment) did not recognize any of the individuals in the lineup."

The lone alleged victim in the charges against the Defendant could not pick the Defendant out of the photo lineup.

It appears that Det. Kniss is actually the person who interviewed the alleged victims. His Statement of "probable cause" starts off with the representation that the parents of Minor #1, (JT), claimed that they had discovered "sexually explicit photographs" on their son's cell phone and they claim that "these pictures were sent to the Dehart in Indiana whom Dehart

3

represented as being teenage females." (DocumentNo.88-1, page 12). During the interview of the minors, both boys claimed that "Dehart had asked each boy to send a picture of his penis to Dehart and to an e-mail account that Dehart stated belonged to some teenage female girls in Indiana"(*Id.*). Each boy claimed that Dehart had sent them several pornographic images to them on separate occasions. *(Id.).* (No reference to child pornography). The forensic interview of the boys does not produce any other information related to the crimes being investigated, to wit, *possession of child pornography and child solicitation which occurred between June, 2008 through January,2009 at the location of Memphis. Tennessee and Warrick County, Indiana.* *(Id.).*

The remainder of Det. Kniss' "probable cause" statement addresses his examination of the "minor victim's computers". Det. Kniss makes the following claims for which there is no explanation of any support or how he arrived at these conclusions:

(A) He recovered several e-mail addresses used by Dehart to communicate with the minor victims over the internet, including some e-mail addresses to which the minor victims had sent nude photographs of themselves. (*Id.*).

(B) A chat log in which he inserts the name "Dehart" (as if it is a screen name). (Det. Kniss' conclusion regarding this chat is that Dehart has knowledge that the nude photos exist—not that he either solicited them or received them).

( C ) An extensive chat log between Minor#1 and "alleged female from Indiana" in which she is discussing with Minor#1 whether he will send her a video. (DocumentNo.88-1, page 13). There is nothing to indicate how Det. Kniss determined this "alleged female" was from Indiana.

4

(D) Det. Kniss found a video on Minor #1's computer which confirmed that one of the "alleged" females had sent him a video of herself masturbating on a bed. *(Id.)*.

Det. Kniss then goes onto make the following statements which are not only misleading but false:

> All of the e-mail addresses and the IP addresses used to send the messages were assigned to DeHart.

> Although a records check indicated that the IP addresses for the e-mail accounts of the alleged teenage females had not been retained due to the time lapse between the incident and the report to law enforcement, the creation dates of those accounts are within the time period that the chat conversations took place. (Document No.88-1, page 14).

Without further explanation, how could the reviewing magistrate conclude whether the nude pictures sent by Minor#1 to the "alleged" female was not in fact a real female? There is absolutely no evidence to suggest that Dehart has anything to do with the crimes being investigated, to wit, *possession of child pornography and child solicitation which occurred between June, 2008 through January,2009 at the location of Memphis, Tennessee and Warrick County, Indiana.*

At the time of the issuance of the search warrant, Det. Kniss failed to include in his probable cause statement facts that support the conclusion that he "alleged" females do exist: as noted above the screen name for the "alleged" female is not "alleged female from Indiana" but "mandyylion092". (Compare chat in DocumentNo.88-1, page 13 with chat in Document No.107-2, page 8). As early as June, 2009, Det. Kniss knew that this e-mail address had an origin zip code of 07882,which is in New Jersey and not Indiana!!! (See Exhibit # 1, provided in discovery).

Det. Kniss also omits that the fact that the cell phone of Minor Victim#1 had a "sexting photograph of at least one minor girl". (See Exhibit # 2, page 3, paragraph 16).

5

This cell phone along with another belonging to JT was conveniently returned by the Franklin Police Department to the minor, thus depriving the Defense of an independent forensic examination of the contents in the hope of tracing the location of this and or other females to whom the minor sent "sexting pictures of himself." (See Exhibit # 3). Thus, it is clear that (1) the affidavit to the search warrant fails to establish probable cause that Defendant was involved in the crimes being investigated, to wit, *possession of child pornography and child solicitation which occurred between June, 2008 through January, 2009 at the location of Memphis, Tennessee and Warrick County, Indiana.* (By the way, what does Memphis have to do with any of this??). Additionally, the intentional misrepresentation that the Defendant is the "alleged female from Indiana" is not supported by anything. In fact, all of the evidence available to Detectives Kniss, Anderson, and Pritchett points to the fact that the female does exist.

Additionally, none of the chat logs provided in discovery or in any of the pre–search warrant investigative documentation suggests a link between alleged females and the state of Indiana. Saying that the females were from Indiana would only have been useful to the prosecution in establishing a location nexus between the Defendant and TN.

As has already been stated, both of the alleged victims "met" the Defendant over the internet in the game World of Warcraft. In this game, the Defendant moderated the activities of over 140 people as a "guild master." Many of those in his guild joined after seeing the guild advertisement on 4chan.org. There seems to have been no effort to subpoena the logs of the "live internet chat" (see Document 88-1 page 12) from this game where the Defendant, PS, JT, and the "alleged" females all communicated. The World of Warcraft chat logs would also contained records of suspected Anonymous members who

6

made up the majority of the Defendant's guild and would have been of interest to the government for other purposes.

It is doubly unreasonable to argue that certain things could not be confirmed solely on the basis of not looking for them. Due diligence would suggest that searching the most obvious places for evidence of a crime would be the first priority but in this case, neither the primary forum by which these individuals communicated (World of Warcraft and Ventrilo chat associated with the game) nor the most likely location for determining if CP was sent by phone (Cellular text message records) were obtained and searched.

The fact is that the chat logs attributed to "DeHart" in the search warrant (See Document 88-1 page 12) were taken from a file from JT's external hard drive. This drive was not entered into Franklin PD evidence until 1-7-09 (See Exhibit # 3), after JT would have known the intent of the Franklin PD investigation. Moreover in all of the chat logs allegedly recovered from the Defendant after the search no corresponding chat segment was found to exist on any computer belonging to the Defendant. Furthermore, even if this were something the detective believed, the Defendant has never denied he knew these events were going on. As the guild master and the host of a Ventrilo server, he was aware of many of the conversations and interactions between guild members. Unfortunately, "sexting" did occur among the 4chan.org community in general.

The defense would also ask the Court to note two things; the affiant in the search warrant, Det. Pritchett requests to search for evidence "related to this case." (see Document 88-1 page 8) and previously in the same document he states that the investigation began with the Memphis FBI field office. The defense was under the impression that the Tennessee investigation began with the Franklin

7

PD ICAC. A national security case begun in Memphis would support the Defendant's initial assertion of a national security motivation for the search and seizure.

Additionally, nowhere in the supporting documents for the search warrant is it mentioned that the Defendant knew and visited a female friend, Heather Casier, attending David Lipscomb University in Nashville, TN. Det. Kniss knew of this individual but omitted to mention her. (See Document No. 105 page 67 at 8).

Most importantly however was the false impression given to the courts that the Defendant travelled to Nashville for implied sexual liaisons or to "groom" individuals. In addition to there being no allegations of sexual impropriety of the Defendant towards PS, PS tipped off the defendant to the investigation and remained in phone contact with him until at least mid January 2009. (See Document No. 105 page 82 at 10). According to the undated Investigative Synopsis, PS *invited* the defendant to meet him (see Document 88-1 page 10). This took place when the Defendant was already intending to travel to Nashville to meet his friend at David Lipscomb University.

As part of the Defendant's military background investigation the government had already interviewed Heather Casier residing in Nashville in the middle of 2008 (See Exhibit #4 ). Again, Det. Kniss was aware of Heather in Nashville, but omitted mentioning her from the search warrant and later criminal complaint (See Document No. 105 page 67 at 8). The detective's omission of this information may have altered the deciding judge's impression of the Defendant's travel from merely visiting a college friend to expressly traveling to meet PS.

The above illustrate intentional misrepresentations of facts material to the issuance of the warrant in violation of *Franks v. Delaware,* 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct. 2674 (1978). Especially troubling is the fact that the allegation the Defendant posed as a female from Indiana was

8

repeated in the criminal complaint used to arrest the defendant on August 6th, 2010 (See Document No. 1, pages 2-3) when investigators had a return from AOL from June 2009 showing that the screen name the Defendant was alleged to have used was registered to someone in NJ and therefore NOT the Defendant in Indiana.

In addition to the cases previously cited in the memorandums in support of the motion to suppress, Defendant refers the Court to *U.S. v. Hodson,* 543 F.3d 286 (6th Cir. 2008) which stands for the proposition that a law enforcement officer may have probable cause to establish a particular crime and obtain a search warrant for evidence of that crime but it does not necessarily establish probable cause for another. In *Hodson,* the affiant established probably cause to search for evidence of one crime, (child molestation) but designed and requested evidence to search for evidence of an entirely different crime (child pornography). (*Id.* at 292). Here, at most, there could be evidence of harassment (spoofing phone calls) or contributing to the delinquency of a minor (providing beer to one of the minors) but there is absolutely no probable cause to believe the Defendant is in any way involved in the crimes being investigated, to wit, *possession of child pornography* and *child solicitation* which occurred between June, 2008 through January, 2009 at the location of *Memphis, Tennessee* and *Warrick, County, Indiana.* Furthermore, there is no nexus whatsoever between any of these alleged crimes and the Defendant's home in Indiana.

Furthermore, not only has Det. Kniss made a gross misrepresentation to the issuing Magistrate that the Defendant is the "alleged female form Indiana" so totally unsupported, the *Leon* "good faith" exception cannot apply. See *US v. Hodson,* 543 F3d at *293; US v Hicks,* 2012 U.S. Dist. Western District of Kentucky.

9

**Part II - Overbreadth**

As set out by the Court in *US v. Hill,* United States Court of Appeals, Ninth Circuit, No. 05-50219, 2006, it is clear that the search and seizure in this case (See Document No. 88-1) is overbroad.

> "We agree with the district court that under the circumstances here, the warrant was not fatally defective in failing to require an onsite search and isolation of child pornography before removing storage media wholesale. That does not mean, however, that the government has an automatic blank check when seeking or executing warrants in computer-related searches. Although computer technology may in theory justify blanket seizures for the reasons discussed above, the government must still demonstrate to the magistrate factually why such a broad search and seizure authority is reasonable in the case at hand. There may well be situations where the government has no basis for believing that a computer search would involve the kind of technological problems that would make an immediate onsite search and selective removal of relevant evidence impracticable. Thus, there must be some threshold showing before the government may 'seize the haystack to look for the needle.'" (*US v. Hill,* 9th Circuit Court of Appeals 2006)

It is hard to believe that given the year delay, the government never checked its own databases for reports on the Defendant. In many of the personal interviews for the Defendant's SSBI background investigation in 2008 (See Exhibit #4), there is mention of his self-employment repairing other individuals' computers and that it was ongoing. None of this is mentioned in the search warrant, there appears to be no effort taken to determine the actual ownership of material taken in the search, nor were there any limitations on searching others' computer equipment. Thus, it appears a drive image from a laptop belonging to a female friend of the Defendant was sent to Det. Kniss to be analyzed (See Exhibit #5).

Also, in the case of *US v. Matthew DeHart,* there is no rationale given for not making an onsite image of the computers, especially of the Gateway laptop which was in the defendant's bedroom (See Document No. 88-1, pages 17-18) and powered on at the time of the search. In fact, according to reports by Sgt. Hill in discovery (See Exhibit # 6, pages 1-3) two hard drives alleged to have come from

10

the Gateway laptop were imaged on two separate days January 29th and January 31st 2010 *after* the return on search warrant on January 28th, 2010.  (See Document No. 88-1, page 16).   If the government wishes to argue that the Gateway Laptop was a computer to be searched, then the two RAID attached drives would have had to remain with the computer as they would not function independently.  This would entail attaching them to another computer simulating the RAID environment and would nullify the "computer" argument.  The government could also argue that since the warrant seeks permission to search hard drives, they could have removed them from the Gateway Laptop and searched them.  Unfortunately, neither hard drive serial number was listed on the return inventory and according to the forensic report, no images were made until after the return.

> "…As we have discussed above, the officers' wholesale seizure was flawed here because they failed to justify it to the magistrate, not because they acted unreasonably or improperly in executing the warrant.   Because the officers were motivated by considerations of practicality rather than by a desire to engage in indiscriminate 'fishing,' we cannot say  that the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed." (*US v. Hill,* 9th Circuit Court of Appeals 2006)

The Court in this case noted that the seizure was flawed but did not feel the warrant was *general* based on the officers' motivation of practicality. In the case of *US v. Matthew DeHart*, there is no indication that making an onsite copy of hard drives would have been impractical.  Since the search warrant began just after 9 a.m. in the morning, and there seems to have been no hurry in drafting or executing the warrant given the year time delay, there certainly would have been no time restraints to a search involving onsite imaging. Additionally, the types of items seized and their locations in the residence could be construed as "indiscriminate fishing." (See Document No. 88-1, pages 17-18)  The entries listed in the search return inventory contain computers and other items seized from rooms other than the Defendant's bedroom. For example item #15 was found in a bathroom and items #1, 2, and 3 were all found in the master bedroom.  Item #25 was found in the kitchen and Item # 27 was found in

the living room. In terms of the type of items taken, item #27 was an XBOX 360 Console with related controls and cords (as well as games not listed on the inventory) taken from the living room. Finally, item #4 was a computer belonging to a business customer of the defendant (See Exhibit # 5). Items taken from places other than the Defendant's bedroom and items clearly with no potential for instrumentality in the case such as a game console are indicative of a general search.

> "New technology may become readily accessible, for example, to enable more efficient or pinpointed searches of computer data, or to facilitate onsite searches. If so, we may be called upon to reexamine the technological rationales that underpin our Fourth Amendment jurisprudence in this technology-sensitive area of the law." (*US v. Hill,* 9th Circuit Court of Appeals 2006)

The technology to conduct the search of the Defendant's home had four additional years to develop since this ruling. Again, there was no rationale given in the search warrant for the necessity of an offsite search of the Defendant's computer data. Perhaps as the Court suggested it is indeed time to "reexamine the technological rationales that underpin our Fourth Amendment jurisprudence."

As the agents performing the search also seemed to have been interested in receipts, they had to have noticed many of these were from the Defendant's computer repair business (See Exhibit #5). The searching agents seemed cognizant enough of which room in the house belonged exclusively to the Defendant yet went in bathrooms and his parent's bedroom to seize things as well. None of the items seized have been returned as of October 2012. When the Defendant's father, acting on the Court's instruction, went to the Warrick Co., Indiana Sheriff's office, he was told that it was an FBI case. Sheriff's office personnel wouldn't even confirm to the Defendant's father that the evidence was actually there. (See Exhibit #7, paragraph 6)

Were the items taken pursuant to the search warrant reasonably expected to contain evidence of the allegations occurring a year previously and after PS's tip off of an investigation? Nowhere in the

12

probable cause and affidavit is it mentioned what is actually being searched for besides "CP" in general, "photos of known victims"(not necessarily pornographic) and evidence of "solicitation." Nowhere does it request to search for AIM chat logs or Verizon text messages. Nowhere does it request to search for locally stored email information. (As the alleged emails were webmail and not POP3; this information, exculpatory or otherwise, would have been located online and not on a local computer.)

Additionally, Det. Kniss lists *Wikileaks,* both in name, site URL, and images as having "evidentiary value" in his forensic reports in discovery. According to Det. Kniss, *Wikileaks* has evidentiary value for the government's case against him in TN. This is not an isolated occurrence as *Wikileaks* appears multiple times in the forensic report provided to the defense. (See Exhibit #8)

In determining whether such an overly broad search was acted on in "good faith" it is essential to know if the purpose of the seizure was solely based on the stated probable cause or whether there was intent to use the evidence in another, national security investigation as well. This has continued to be the contention of the defense based on the totality of the government actions in this case. Unfortunately neither chain-of-custody documentation for the items seized in the January 2010 search nor any findings from the DC national security investigation have been provided to the defense.

### Part III-Undue delay

Though the wording in the probable cause (See Document No. 88-1) seems urgent and timely, in fact **an entire year passed from the beginning of the investigation in January 2009 until the search and seizure in 2010**. Though the Court specifically asked for a timeline of the progress of Det. Kniss' investigation, none was provided.

> "A seizure affects only the person's possessory interests; a search affects a person's privacy interests.' *Segura v. U.S.,* 1984. The longer the police take to seek a warrant, the greater the

13

infringement on the person's possessory interest will be. . . . But unnecessary delays also undermine the criminal justice process in a more general way: they prevent the judiciary from promptly evaluating and correcting improper seizures. *U.S. v. Burgard,* 2011. "

These cases refer to a failure to issue a timely warrant after a warrantless seizure but are applicable in the present case because the vast majority of the information used for the probable cause seems to have been known to the Franklin Police no later than June of 2009. The only assertions concerning actual CP itself come from information the Franklin police obtained in January 2009. Again, there has been no explanation for the long delay in investigating the case. This has presented a problem for the defense in terms of potential exculpatory evidence preservation due to data retention policies of cell phone and internet service providers especially as no preservation letters were sent from those investigating the Defendant.

According to the prosecution Det. Kniss did not receive a copy of the alleged Gateway hard drives until July 2010. **Six months after the search.** From AUSA Daughtrey's Response to Request on June 21, 2012 dated Jun 27th, 2012 - Section Two paragraph 12 (Exhibit# 9, page 5, paragraph 12)

> "… As related to you verbally, Det. Kniss received a copy of the copy of the laptop in July of 2010, and had begun his forensic analysis prior to that."

There is no reasonable explanation as to why six months would elapse prior to the lead detective in the case against the Defendant receiving a reconstructed copy of electronic copies of the two hard drives allegedly taken from the Defendant's primary computer.

The prosecution has also threatened to introduce "recently discovered" alleged evidence taken in the search of his residence in 2010 against the Defendant **over two years** after the search warrant was executed. In the government's response filed 4/20/2012 to the defendant's Motion to Compel (See Doc No. 80) in paragraph 3, AUSA Daughtrey says:

14

"Subsequent to the hearing on April 9[th], 2012, the parties conferred, and Det. Brett Kniss assured the defense that the government had provided copies of all written reports in this case. The detective explained that he more recently received an additional hard drive that contained child pornography but for which he has not written a report. Once that information is complete, it will be provided to the defense."

There was no indication as to what hard drive the government was referring nor from where Det. Kniss had received this hard drive. Det. Kniss was said to have been doing a forensic report on this hard drive in April 2012. The defense has not been given any such report in discovery and Detective Kniss has since resigned from the Franklin PD. Why would a copy of a hard drive taken in the original search turn up over two years later without a chain of custody explaining where it had been? This is clearly undue delay as well as failure to provide timely discovery. If Det. Kniss could perform an analysis of an aged Dell Laptop belonging to one of the Defendant's computer customers, Crystal Chambers (See exhibit #5) in found in a closet of a spare bedroom in the Defendant's residence in 2010, then why would he just be analyzing another alleged hard drive belonging to the Defendant and presumed to have come from the original search some two years later?

### Part IV – Best Evidence

Several questions arise from the handling of the defendant's Gateway laptop's hard drives. First, neither of the hard drives nor their serial numbers appear on any inventory including the return from search warrant (See Document 88-1, pages 17-18). Compare this to the inventory of items provided to the defense seized from the Defendant's Canadian apartment (See Document No. 123-2, page 9) in support of the case in TN (See Exhibit #10) and logged into evidence in Washington, DC on 03/22/2011. The Canadian police cataloged actual serial numbers of the *hard drives* removed from several computers and placed them in sealed bags with control numbers. There is nothing in the discovery given to the defendant in TN besides a statement by Sgt Hill to indicate that the hard drives

15

which he imaged came from the defendant's Gateway. Secondly, the two drives Sgt. Hill says he imaged were imaged *after* the return of the Indiana search warrant raising questions about his authority to search them. According to The Justice Department:

" In many cases, rather than seize an entire computer for off-site review, agents can instead create a digital copy of the hard drive that is identical to the original in every relevant respect. This copy is called an "image copy"—a copy that "duplicates every bit and byte on the target drive including all files, the slack space, Master File Table, and metadata in exactly the order they appear on the original." United States v. Vilar, 2007 WL 1075041, *35 n.22 (S.D.N.Y. Apr. 4, 2007), quoting Orin S. Kerr, Searches and Seizures in a Digital World, 119 Harv. L. Rev. 531 (2005); see also United States v. Stierhoff, 477 F. Supp.2d 423, 439 & n.8 (D.R.I. 2007). An image copy cannot be created by simply dragging and dropping icons or running conventional backup programs; the process of making one usually involves opening the computer case and connecting the investigator's own hardware directly to the hard drive. In some cases, investigators will make the image copy on-site; in others, investigators will seize the computer hardware from the premises and make the image copy off-site. To justify the possible imaging and/or removal for off-site review of a computer or other storage media, the Ninth Circuit requires the affidavit to explain why practical constraints might require the seizure of the entire computer system for off-site examination. See United States v. Hill, 459 F.3d 966, 975-76 (9th Cir. 2006) (stating that the affidavit must "demonstrate to the magistrate factually why such a broad search and seizure authority is reasonable in the case at hand"). As imaging and/or removal is necessary in nearly every computer search warrant case, it is doubtful that failure to include such a statement in the affidavit constitutes a Fourth Amendment violation. Nevertheless, although explicitly required only by the Ninth Circuit, it is a good practice for every search warrant affidavit to explain why it is necessary to image an entire hard drive (or physically seize it) and later examine it for responsive records. Including these facts in the affidavit provides a considerable degree of reassurance that the Fourth Amendment will be satisfied. See United States v. Hill, 459 F.3d 966, 976 (9th Cir. 2006); United States v. Hay, 231 F.3d 630, 637 (9th Cir. 2000) ("the affidavit explained why it was necessary to seize the entire computer system" and "justified taking the entire system off site because of the time, expertise, and controlled environment required for a proper analysis"); United States v. Adjani, 452 F.3d 1140, 1149 n.7 (9th Cir. 2006). As noted below, these facts justifying removal of storage media for off-site review should not commit the agents to any particular "protocol" for reviewing the media to find evidence that falls within the scope of the warrant. Instead, the affidavit will simply note that off-site review might be required. " *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations,* DOJ 2009

An email from AUSA Daughtrey to the defense attorney dated May 31st, 2012 3:03pm (Exhibit # 11) contains an undated paragraph from Sgt. Hill. In it he says:

> "Regarding Matthew Dehart's computer, I created forensic images of both hard drives located in the laptop computer."

The entry in discovery with the heading "DeHart Laptop Computer" does not appear to be an EnCase report but rather something "cut and pasted." The information for "File Integrity:" and more importantly "Acquisition Hash:" appear to be missing for both hard drives. (See Exhibit #6, pages 1-3) For comparison notice EnCase report in discovery labeled "Victim 1 80 GB HD Drive Info" which has both File Integrity data and Acquisition Hash data (See Exhibit # 12). It appears that there is no acquisition Hash Value for the original images of the two laptop hard drives Sgt. Hill says were taken from the Defendant's laptop. Without acquisition hash values there is no original with which to compare copies to ensure date integrity. The Harvard Law Review describes the importance of maintaining the evidentiary integrity of the original evidence via an acquisition hash.

> "To ensure the evidentiary integrity of the original evidence, the computer forensics process always begins with the creation of a perfect "bitstream" copy or "image" of the original storage device saved as a "read only" file. All analysis is performed on the bitstream copy instead of the original. The actual search occurs on the government's computer, not the defendant's. A bitstream copy is different from the kind of copy users normally make when copying individual files from one computer to another. A normal copy duplicates only the identified file, but the bitstream copy duplicates every bit and byte on the target drive including all files, the slack space, Master File Table, and metadata in exactly the order they appear on the original. Whereas casual users make copies of files when their machines are running, analysts generally create bitstream copies using special software after the computer has been powered down. The bitstream copy can then be saved as a "read only" file so that analysis of the copy will not alter it. The accuracy of the bitstream copy often is confirmed using something called a "one way hash function," or, more simply, a "hash." A hash is a complicated mathematical operation, performed by a computer on a string of data, that can be used to determine whether two files are identical. If two nonidentical files are inputted into the hash program, the computer will output different results. If the two identical files are inputted, however, the hash function will generate identical output. Forensic analysts can use these principles to confirm that the original hard drive and the bitstream copies are identical." Kerr, Orin S (2005). *Searches and Seizures in a Digital World. Harvard Law* Review, Vol. 119, p. 541

17

# CONCLUSION

The defense maintains that the search warrant was not an isolated violation of the Defendant's rights but part of a pattern of bad faith on the part of the government from 2009 until now. If the burden to demonstrate this beyond those items noted above and in the previous motions and supplements falls solely on the part of the Defendant then the Defendant requests from the Court that the government provide all reports by the FBI including those classified on every aspect of the fruits of the assumption of his online identity beginning in August 2010 and rationale for deleting his email account(s). The government asked the Defendant about aspects of the Tennessee investigation in the course of its classified national security interrogations of the Defendant and two items of evidence cited in the Tennessee investigation are included in the unclassified FD-302 from another national security interrogation provided by the FBI (See Document No. 123-2, pages 4-8). Should the Defendant need to make further showing, he would request a hearing per the Classified Information Procedures Act.

Therefore, for all of the reasons cited above, the Defendant requests the Court to exclude from the evidence presented at the trial of this matter all items listed in the inventory if items taken from the Defendant's residence in January 2010 (See Document No. 88-1, pages 17-18) and any other evidence discovered as a result of the seizure of these items. Additionally, the Defendant requests that the two computers seized from Canada which were noted in the FBI "consent" form denying the search/seizure thereof, be returned to the Defendant or a Canadian consulate.

18

Respectfully submitted,

Matthew P. DeHart

Defendant

8900 Andrea Court

Newburgh, IN 47630

812.549.9371

### CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Ms. Carrie Daughtrey, Assistant U.S. Attorney, 110 Ninth Avenue South, Suite A-961, Nashville, TN 37203, on this the _6th_ day of November, 2012

Matthew P. DeHart